IN RE APPLICATION TO HAVE RICHARD HILL ADJUDGED MENTALLY ILL. RICHARD HILL, APPELLANT, V. COUNTY BOARD OF MENTAL HEALTH, DOUGLAS COUNTY, NEBRASKA, APPELLEE.

279 N. W. 2d 838

Filed June 5, 1979. No. 42095.

Thomas M. Kenney, Douglas County Public Defender, and Bennett G. Hornstein, for appellant.

Donald L. Knowles, Douglas County Attorney, Jerry L. Stejskal, and Jerry W. Katskee, for appellee.

Heard before KRIVOSHA, C. J., WHITE, and HASTINGS, JJ., and REIMER and HIPPE, District Judges.

HASTINGS, J.

This is an appeal under the provisions of section 83-1043, R. R. S. 1943, from an order of the District Court for Douglas County, affirming the order of the county mental health board. That board found that Richard Hill was a mentally ill dangerous person as defined by section 83-1009, R. S. Supp., 1978, and committed him to the Lincoln Regional Center for treatment under the provisions of section 83-1037, R. R. S. 1943.

Upon appeal to this court it is assigned as error that the evidence was insufficient to support the finding that Richard Hill was a mentally ill dangerous person in need of board-ordered treatment.

Mental commitment proceedings are judicial in nature and the District Court must review the determination of the mental health board de novo on the record. Lux v. Mental Health Board of Polk County, 202 Neb. 106, 274 N. W. 2d 141 (1979); § 83-1043, R. R. S. 1943. The trial court's "Finding and Order" indicate that this was done. The same statute requires that the "order of the district court may be appealed to the Supreme Court in accordance with the procedure in criminal cases." Therefore, this court will not interfere on appeal with a final order made by the District Court in a mental health commitment proceeding as provided by section 83-1043, R. R. S. 1943, unless this court can say as a matter of law that it is not supported by clear and convincing proof. § 83-1037, R. R. S. 1943; Lux v. Mental Health Board of Polk County, *supra;* State v. Sommers, 201 Neb. 809, 272 N. W. 2d 367 (1978).

"Mentally ill dangerous person shall mean any mentally ill person or alcoholic person who presents: (1) A substantial risk of serious harm to another person or persons within the near future, as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or (2) A substantial risk of serious harm to himself within the near future, as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm, or evidence of inability to provide for his basic human needs, including food, clothing, shelter, essential medical care, or personal safety." § 83-1009, R. S. Supp., 1978. "A final hearing shall be held by the mental health board to determine whether there is clear and convincing proof that the subject of a petition is a mentally ill dangerous person and that neither voluntary hospitalization nor other alternatives less restrictive of his or her liberty than a mental health board ordered treatment disposition are available or would suffice to prevent the harm

described in section 83-1009. * * *." § 83-1035, R. R. S. 1943.

The hearing before the mental health board was held on February 14, 1978, and Hill was represented throughout by counsel. Two psychiatrists, Dr. David Goldberg and Dr. Frank Menolascino, testified, the latter having been called by Hill. Without going into a great amount of detail, the histories obtained by the two physicians indicated a 25-year-old male Caucasian who was first committed to the Lincoln Regional Center in 1959 at the age of 6 years. Since 1965 he has been institutionalized, sometimes on leave, until the present time with the exception of approximately 3 to 4 years. Dr. Goldberg diagnosed him as having a personality disorder of an explosive type which he said carried with it the possibility of "dangerousness" as in a true psychotic personality. Dr. Menolascino essentially agreed with the findings and diagnosis of Dr. Goldberg, agreed that Mr. Hill was suffering from a form of mental illness, and gave as his opinion that Hill could not function outside of a structured institutional setting. Both physicians testified that the "personality disorder" of the type from which Mr. Hill is suffering is classified by the Diagnostic and Statistical Manual edited by the American Psychiatric Association as a mental illness, and that this manual is used as a handbook by psychiatrists in determining the existence of mental illnesses.

It appears obvious that the evidence presented by the two medical witnesses clearly and convincingly establishes that Hill is "mentally ill" within the meaning of section 83-1009, R. S. Supp., 1978.

In making the findings that Hill presented a substantial risk of serious harm to another or to himself as evidenced by recent acts or threats of violence, the board and the District Court considered several incidents.

On May 24, 1977, while an inmate in the Douglas

County jail, Hill was found sitting on his bunk with a rope, braided from torn strips of bedsheets, fastened around his neck. Sergeant Podjenski of the Douglas County sheriff's department testified that the rope was, in his opinion, of sufficient strength to hold a man's body and there was a shelf approximately 7 feet off the floor to which the rope could be tied. Hill stated to the sergeant that he wanted to kill himself.

On October 13, 1977, Sergeant Richard Lubash, also of the Douglas County sheriff's department, after receiving information of an alleged overdose of self-administered medicine, talked to Hill who admitted he had been saving up 200-milligram Thorazine pills and had taken seven of them all at once. There is no direct evidence of the possible effect of such a dosage. However, Dr. Menolascino in his testimony referred to them as tranquilizers and that his regular dosage was 200 milligrams a day. This must be viewed against additional testimony of Dr. Menolascino that in the past, while at the Regional Center, Hill had used staples and other sharp instruments to stick in his arm and pump ink from ink refills into his veins which required periods of hospitalization at Lincoln General Hospital. Although the witness testified that Hill's actions were not deliberately suicidal, but rather an attempt at recognition and change of environment, they would have endangered his life if not discovered in time and met with medical attention.

The point is, of course, that although Hill may not be suicidal in the true sense, he is capable of taking extreme steps which admittedly could endanger his life or health.

Deputy Sheriff Clemens testified that on January 5, 1978, Hill told him that he would gladly blow up his car for $50 and if he, Clemens, tried to stop him, he would blow him up for free. Hill had also told this same deputy on several occasions that it didn't bother him to hurt people.

The violent acts described above occurred within periods of 9 months, 4 months, and 6 weeks, respectively, of the hearing. The question presented by this appeal is whether they were sufficiently "recent" within the meaning of the law. It should be said at the outset that they all happened while Hill was in custody.

Furthermore, the court can not blindly disregard other incidents more remote in time which give some insight into this man's mental state. The incidents with the ink have been previously mentioned. In addition, in 1970, while Hill was working for a used car dealer, he became angry at his employer over a wage dispute and set fire to one of his vehicles. This incident led to a mental commitment. Also, and although the record is not all that clear, it appears that Mr. Hill's present contact with mental health proceedings stems from a murder charge dating back to July of 1974. Dr. Goldberg, in his report, states: "Mr. Hill was transferred from the Douglas County Jail to the Douglas County Hospital following a successful plea of not guilty for reasons of insanity on the charges brought in connection with a crime committed in Omaha, Nebraska on July 24, 1970, [sic] this crime involved both murder and rape." Quoting from Dr. Menolascino's report, he said: "I was asked to examine him in regards to assessing his competency to stand trial for an alleged murder charge."

The final question: Does he present a substantial risk of serious harm to another or himself as manifested by recent acts or threats of violence? Looking at his entire psychiatric background it appears obvious that he presents a potentially substantial risk of harm both to others and to himself. What, then, is a recent act? There is no way to establish a definite time-oriented period such as 1 week or 1 month, or for that matter, 1 year. Each case must be decided on the basis of the surrounding facts and

circumstances. If a person commits an act and nothing at all is done for 1 year, we would be hard pressed to define that as a "recent act." On the other hand, if a person kills another and is tried for murder and a year later, after having been held in custody all that time, is finally adjudged innocent by reason of insanity, it would be ridiculous to say that the killing was not a "recent violent act."

Although not entirely on point, Kraemer v. Mental Health Board of the State of Nebraska, 199 Neb. 784, 261 N. W. 2d 626 (1978), contains some appropriate language and reasoning. In that case, Kraemer had committed an act or threat in May of 1975. He was committed under the previous mental health law of Nebraska, which had been declared unconstitutional. The reported case does not indicate when he was recommitted upon rehearing under the present Nebraska Mental Health Commitment Act, but the transcript on file in the clerk's office indicates that it was in August of 1976. Quoting from the case itself: "The essence of Kraemer's second assignment is that the record shows no *recent* violent act, or threat of violence, or the placing of a person in reasonable fear of harm. We have earlier reviewed the evidence. We hold that the incident of May 1975 was sufficiently recent to conform to the meaning of the statute. Any other view would require, as to those already committed when the enforcement of the former act was enjoined and who were entitled to a new hearing under section 83-1072, R. R. S. 1943, the discontinuance of treatment and release in order to afford an opportunity for a more recent act of violence before any rehearing and further commitment could take place. Such would be contrary to the evidence and expressed purposes of section 83-1072, R. R. S. 1943, when read in conjunction with the entire act." In Lux v. Mental Health Board of Polk County, 202 Neb. 106, 274 N. W. 2d 141, the act occurred on November 23, 1976, and the hearing commenced on

February 16, 1977. In that case, objection was made that evidence of only one act was tendered whereas the statutes speak in terms of evidence of "recent violent *acts*." (Emphasis supplied.) This court's answer was: "The contention of Lux that the evidence is insufficient because the evidence shows only one violent act against a person is also without merit. It is true that section 83-1009 (1), R. R. S. 1943, refers to 'recent violent acts.' However, to read the statute as requiring evidence of more than one violent act or threat would be ridiculous. It obviously contemplates the admission of evidence of as many recent violent acts or threats as there may be."

The term recent should be given a reasonable construction. We hold that an act or threat is "recent" within the meaning of section 83-1009, R. S. Supp., 1978, if the time interval between it and the hearing of the mental health board is not greater than that which would indicate processing of the complaint was carried on with reasonable diligence under the circumstances existing, having due regard for the rights and welfare of the alleged mentally ill dangerous person and the protection of society in general.

The acts and threats in this case were "recent" and the judgment of the District Court was correct and is affirmed.

AFFIRMED.

HIPPE, District Judge, concurs in result.