IN RE INTEREST OF MARK TWEEDY, ALLEGED TO BE A MENTALLY ILL
DANGEROUS PERSON.
STATE OF NEBRASKA, APPELLEE, V. MARK TWEEDY, APPELLANT.
488 N.W.2d 528

Filed August 28, 1992.    No. S-91-114.

David C. Mitchell, of Yost, Schafersman, Yost, Lamme, Hillis & Mitchell, P.C., for appellant.

Dean Skokan, Dodge County Attorney, and Joe Stecher for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

Mark Tweedy appeals from a district court affirmance of a mental health board determination that Tweedy was a mentally ill and dangerous person who required full-time inpatient hospitalization at the Lincoln Regional Center.

## FACTS

On January 17, 1989, appellant was sentenced to 20 months to 5 years' imprisonment for sexual assault on a child. The court found that appellant was a treatable, mentally disordered sex offender (MDSO) and committed him to the Lincoln Regional Center. At that time, the regional center was full, and Tweedy was placed on a waiting list. Eleven months later, Tweedy still had not been admitted, and the court revised its prior order by finding that treatment was not available for him, thereby leaving Tweedy under the supervision of the Nebraska Department of Correctional Services. While in prison, Tweedy was involved in several MDSO rehabilitation programs. Tweedy was paroled August 21, 1990; however, the State filed a mental health commitment proceeding against Tweedy in anticipation of his release.

Tweedy was found by the mental health board, under the clear and convincing standard, to be a mentally disordered and dangerous sex offender and was committed to full-time inpatient hospitalization at the Lincoln Regional Center. The matter was then appealed to the district court for Dodge County, where the determination was affirmed.

## ASSIGNMENTS OF ERROR

Appellant, Tweedy, claims that the district court erred in finding (1) that by clear and convincing evidence he was mentally ill, and by further reliance upon the opinion of a clinical psychologist who failed to qualify her opinion to a reasonable degree of psychological certainty; (2) that Tweedy was a dangerous person, as defined in Neb. Rev. Stat. § 83-1009 (Reissue 1987); (3) that there was no less-restrictive alternative of Tweedy's liberty than a mental health board-ordered treatment disposition; and (4) that Tweedy requires full-time inpatient hospitalization as opposed to an outpatient program or another less restrictive program.

## DISCUSSION

A "mentally ill dangerous person" is one who presents a substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm. In determining whether a person is dangerous, the focus must be on the subject's condition at the time of the hearing. Actions and statements of the person alleged to be mentally ill and dangerous which occur prior to the hearing are probative of the subject's present mental condition. § 83-1009 and Neb. Rev. Stat. § 83-1035 (Reissue 1987). See, also, *In re Interest of McDonell*, 229 Neb. 496, 427 N.W.2d 779 (1988).

Section 83-1035 provides, in pertinent part:

A hearing shall be held by the mental health board to determine whether there is clear and convincing proof that the subject of a petition is a mentally ill dangerous person and that neither voluntary hospitalization nor other alternatives less restrictive of his or her liberty than a mental health board-ordered treatment disposition are available or would suffice to prevent the harm described in section 83-1009.

In reviewing a final order made by the district court in mental health commitment proceedings, this court must affirm the order of the district court unless, as a matter of law, the order is not supported by clear and convincing evidence. *In re Interest of McDonell, supra*; *In re Interest of Kinnebrew*, 224 Neb. 885, 402 N.W.2d 264 (1987); *State v. Steele*, 224 Neb. 476, 399 N.W.2d 267 (1987). See, also, Neb. Rev. Stat. § 83-1043 (Reissue 1987).

While we have said that the actual assessment of the likelihood of danger calls for an exercise of medical judgment, the sufficiency of the evidence to support such a determination is fundamentally a legal question. *In re Interest of Blythman*, 208 Neb. 51, 302 N.W.2d 666 (1981); *Lynch v. Baxley*, 386 F. Supp. 378 (M.D. Ala. 1974), *rev'd on other grounds* 651 F.2d 387 (5th Cir. 1981). See *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984). Dr. Suzanne Bohn testified that she is a certified and licensed practicing clinical psychologist in the State of

Nebraska. As such, she was a mental health professional competent to testify as to the mental condition of a person against whom a mental health complaint had been issued, pursuant to Neb. Rev. Stat. § 83-1010 (Reissue 1987), which provides that a "[m]ental health professional shall mean a practicing [licensed] physician . . . or a practicing clinical psychologist." See, also, *Sanchez v. Derby*, 230 Neb. 782, 433 N.W.2d 523 (1989).

Dr. Bohn further testified, with a reasonable degree of medical certainty, that in her opinion Tweedy suffered from a mental illness, pedophilia. Though Dr. Bohn is not a physician, the opinion was given with reasonable certainty and the term "medical" is mere surplusage.

Finally, when asked whether a pedophile's major milestone was recognition of the problem, Dr. Bohn stated that it is

> kind of like the beginning of treatment. I mean, you can't really do treatment until a person is willing to accept some responsibility for his behavior and makes some qualified admission of guilt. That's when treatment begins. So some people may be, quote, in treatment for years and never get to that point, but once you reach that point that doesn't mean [you're cured, but] you've changed."

The appellant does not contest that he is a pedophile. The first assignment is without merit.

We next address the issue of appellant's dangerousness. Although attempts to predict future conduct are always difficult, and confinement based upon such a prediction must always be viewed with suspicion, we believe civil confinement can be justified in some cases if the proper burden of proof is satisfied and dangerousness is based upon a finding of a recent overt act, attempt, or threat to do substantial harm to another. *In re Interest of Blythman, supra.*

In *In re Interest of Blythman*, we provided a detailed analysis on the issue of dangerousness. In that case, we said that in order for involuntary commitment on the basis that someone is "dangerous" to comply with due process, there must be a finding that there is a substantial likelihood that dangerous behavior will be engaged in unless restraints are applied.

"To confine a citizen against his will because he is likely to

be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another."

*In re Interest of Blythman*, 208 Neb. at 57, 302 N.W.2d at 671, quoting *Lynch v. Baxley*, 386 F. Supp. 378 (M.D. Ala. 1974).

We went on to hold that in order to achieve a proper determination of dangerousness, focus must be on the defendant's condition at the time of hearing. We recognized, however, that actions and statements of a person alleged to be mentally ill and dangerous which occur prior to the hearing are probative of the subject's present mental condition. See, also, *Lynch v. Baxley, supra.*

In order for a past act to have any evidentiary value, it must form some foundation for a prediction of future dangerousness and be, therefore, probative of that issue. *In re Interest of McDonell, supra ; In re Interest of Blythman, supra.*

Under the Nebraska Mental Health Commitment Act, the determination of whether an act of violence is recent must be decided on the basis of all the surrounding facts and circumstances. *In re Interest of Blythman, supra.* Accord *Hill v. County Board of Mental Health*, 203 Neb. 610, 279 N.W.2d 838 (1979).

We held in *In re Interest of Blythman* that the defendant's act 5 years prior to the hearing, on the question of whether defendant was mentally ill and dangerous and required continued involuntary commitment, was not too remote to be probative of defendant's present state of dangerousness, particularly where the defendant, like Tweedy, had not had the opportunity to commit a more recent act in the intervening years because of his incarceration. Thus, it was and is proper to consider an act, such as the sexual assault of a child, as "recent."

The argument [that such an interpretation of "recent" would permit involuntary commitment regardless of how remote in time the acts or threats of violence are] is well taken. However, such a result does not necessarily follow if it is kept in mind that any act that is used as evidence of dangerousness must be sufficiently probative to predict

future behavior and the subject's present state of dangerousness. . . . Considering all of the factors, we cannot say that as a matter of law an act which occurred 5 years ago is too remote to be probative of the subject's present state of dangerousness. This is particularly true since the subject did not have an opportunity to commit a more recent act in the intervening years.

. . . We cannot believe that the Legislature intended that by requiring a recent act or threat, a mentally ill person should be given the opportunity to commit a more recent act once a sufficient amount of time has passed since the last act. Judicial action need not be forestalled until another young girl is sexually assaulted, or some other harm takes place. *In re Powell*, 85 Ill. App. 3d 877, 407 N.E.2d 658 (1980); *In re Janovitz*, 82 Ill. App. 3d 916, 403 N.E.2d 583 (1980).

*In re Interest of Blythman*, 208 Neb. at 59, 302 N.W.2d at 672. Accord *Kraemer v. Mental Health Board of the State of Nebraska*, 199 Neb. 784, 261 N.W.2d 626 (1978).

In Tweedy's certificate of parole, dated August 21, 1990, Nebraska's Board of Parole acknowledged that Tweedy "is eligible for parole and believes there is a reasonable probability said individual will lead a law abiding life and further believes release of said individual is compatible with the welfare of society." Said release was not contingent on any assessment of Tweedy as an MDSO or any other evaluation. He had simply served a percentage of his sentence and was up for parole based on his good behavior and had done nothing in the incarcerated setting that indicated that he was a danger to society. Certainly Tweedy was not a danger to the adult males in the penitentiary with whom he came in contact, as that was not a section of the population with which Tweedy had the history of sexually assaultive and abusive behavior. As we have said, however, in civil mental health commitment proceedings, a medical professional must testify that the subject is both mentally ill and a danger to himself or herself or others to a reasonable degree of medical certainty. Dr. Bohn testified only as follows:

[Prosecution:] Has [Tweedy's] treatment with your program progressed to the point of where you believe he is not a risk if he would be released into the community?

[Dr. Bohn:] That's a difficult question to answer because I'm not sure we are ever really able to judge whether somebody is going to be at risk until they're out in the community. With this type of a disorder, the words, quote, "cure," really don't apply. It's not an appropriate kind of word to use with this kind of disorder. So technically, in a way, it's similar to an alcoholic, in that the potential is always there, you know, to either go back to drinking or whatever, or to follow up with your desires to assault young children. With the alcoholic, they don't forget about drinking, just like he's not going to forget about boys and boys are always going to be around him. Even if he makes an effort to stay away from areas, you know, where they frequent, he's still going to be coming in contact with them. So I think there's always going to be a risk that he's going to re-event.

When asked whether she thought Tweedy had any personality trait that made him more likely to offend, Dr. Bohn indicated that Tweedy's manipulativeness, his desire to get what he wants at other people's expense, and his "passive-aggressive streak" made him more likely to offend; however, he didn't "possess some of the other characteristics of other individuals who would be more likely to offend. So it's just a difficult question to answer." Dr. Bohn would not testify to a reasonable degree of medical or psychological certainty that there was a substantial likelihood Tweedy would recidivate.

The facts remain clear. Tweedy did participate in MDSO groups while he was incarcerated; however, he was not treated. While he contends that he has recognized his problem and is allegedly currently engaged to be married, he admits to a lingering attraction toward young boys. A residual attraction does not, in and of itself, translate into guaranteed recidivism. We cannot infer that activity when the expert witness will not testify, to a reasonable degree of certainty, to an opinion as to the offender's dangerousness.

The case must be reversed and remanded to the district court with directions to the mental health board to accord the appellant a new hearing or to order him released from custody.

REVERSED AND REMANDED WITH DIRECTIONS.

CAPORALE, J., dissenting.

Although I agree with the majority's ruling, I write separately because I fear the treatment it accords Dr. Suzanne Bohn's testimony bespeaks a disquieting tolerance for sloppiness.

Bohn is a clinical psychologist, not a doctor of medicine. Thus, she should have been asked to express her opinions not in terms of reasonable medical certainty, but in terms of reasonable psychological certainty. *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990). Yet, either because she did not listen to the question or because she is quite willing to take unto herself credentials she does not possess, she unabashedly undertook to speak as a doctor of medicine. Neither phenomenon is mere surplusage; her testimony should be discredited as a matter of law.